USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/6/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

    -v-

AMNON FILIPPI,
   a/k/a "Amnon Eric Filippi,"
   a/k/a "Jew E,"
THOMAS MOTLEY,
   a/k/a "Thomas Percell Motley,"
   a/k/a "Tom Dewey,"
   a/k/a "Tom P. Motley," and
ROBERT BURKE,
   a/k/a "Bobby Burke,"

                      Defendants.
------------------------------------------------------------X

No. 12 Cr. 604 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Defendants in this case are charged in a two-count superseding indictment with conspiracy to distribute and possess with intent to distribute one hundred or more marijuana plants, in violation of 21 U.S.C. § 846, and with distribution and possession with intent to distribute one hundred or more marijuana plants, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

Before the Court is Defendant Thomas Motley's motion to suppress post-arrest statements. On January 16, 2013, the Court ordered an evidentiary hearing, United States v. Filippi, No. 12 Cr. 604 (RA), 2013 WL 208919, at *9 (S.D.N.Y. Jan. 16, 2013),[1] which was held on May 29, 2013. For the reasons set forth below, the Court finds that Motley's post-arrest statements were made after he initiated further discussion with police and knowingly and voluntarily waived the Miranda rights he had previously invoked. Accordingly, Motley's motion

---

[1] The Court's January 16, 2013 Order denied in all other respects the pretrial motions brought by Motley and co-defendant Robert Burke. (Id.)

is denied.

## BACKGROUND[2]

Motley was arrested on July 13, 2012. (GX 1; Motley Aff. ¶ 3.) Homeland Security Investigations ("HSI") Special Agent Timothy Auman, who testified at the May 29th hearing, participated in Motley's arrest. (May 29, 2013 Hr'g Tr. ("Tr.") 3:25-4:1.)

Following his arrest, Motley was taken to HSI offices on West 26th Street in Manhattan where he provided HSI Special Agent Perry Kao pedigree information for a "USM Form 312 (Prisoner Intake)" form. (GX 2; Tr. 4:11-12, 10:1-6.) The form indicates, among other things, that Motley was thirty-eight years old at the time of his arrest, that he had attended "some college," and that he was arrested in 1999. (GX 2; Tr. 10:10-21.)

Subsequently, in an interview room, Auman observed his group supervisor, Special Agent Michael Ortiz, use a U.S. Immigration and Customs Enforcement "Statement of Rights" form to read Motley his Miranda rights. (GX 1; Tr. 5:6-14, 17:14-18.) After Ortiz read Motley each of his rights and verbally confirmed that he understood them, Motley put his initials after each of the rights listed on the form. (GX 1; Tr. 5:6-6:22.) He then declined to waive these rights, as evidenced by Ortiz's handwritten comment at the bottom of the form stating that Motley "understood his rights but declined to waive his rights." (GX 1; Tr. 12:16-18.) Motley also verbally indicated that he "did not want to talk to" the HSI agents. (Tr. 7:3-7.) Auman testified that Motley did not request counsel. (Tr. 7:8-11.)

Upon Motley informing the agents that he did not wish to waive his rights, Ortiz and Auman "terminated the interview" and "cease[d] questioning him." (Tr. 7:19-21, 12:19-25.) Although Auman "did not specifically tell anybody that [Motley] waived Miranda," he testified

---

[2] The following facts are drawn from the testimony and exhibits provided at the evidentiary hearing, as well as from the affidavit Motley submitted in connection with the instant motion.

that "it was known to the other agents in the area that he did not wish to speak." (Tr. 13:8-13.)

Approximately 30 minutes later, (Tr. 8:16-20; 28:4-6), the following exchange transpired:

> Q. Did there come a time after this interchange [in which Motley indicated that he did not want to talk to the agents] that the defendant addressed you?
> A. Yes.
> Q. Can you tell us what happened?
> A. Shortly before we were going to transport Mr. Motley to the courthouse, he addressed me. He asked, let me ask you a question. I said okay. And he said, how did you all find me?
> Q. And did you respond to that?
> A. I said, how do you think we found you?
> Q. And did Mr. Motley respond to that?
> A. Yes, he did.
> Q. And what did the defendant say?
> A. In sum and substance, he posited that it could be a bank account or a telephone that led us to find him.

(Tr. 7:24-8:12.)

Auman described his response ("[H]ow do you think we found you?") to Motley's question ("[H]ow did you all find me?") as "an effort to blow [Motley] off, to not give any type of real answer, just to kind of place it in his mind that [Auman] wasn't going to discuss any type of substantive criminal investigative techniques with [Motley]." (Tr. 8:21-9:2.) Although five agents (including Auman, Ortiz and Kao) were involved in Motley's arrest and processing, no agent other than Auman was alone with Motley during that half hour period, and no one else was present during the exchange. (Tr. 8:13-15, 13:16-14:10, 28:8-29:4.) To the best of Auman's recollection, Motley was not handcuffed during any of his interactions with him. (Tr. 19:11-13.) None of the officers had weapons in their possession at that time. (Tr. 19:5-10.)

In connection with the instant motion, Motley submitted an affidavit dated November 21, 2012. The relevant portion of the affidavit states:

> On July 13, 2012, I was arrested. To the best of my recollection, following my

arrest, the following events transpired:

> a. Law enforcement agents brought me by car to an office building where I was placed into a small room. I was handcuffed.
>
> b. In the room, I was told my rights and asked whether I wanted to cooperate with the authorities. I told the officers that I wanted a lawyer.
>
> c. Following this, in response to questioning by one of the agents I made statements.

(Motley Aff. ¶¶ 3-4.)

## DISCUSSION

Pursuant to Miranda v. Arizona, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). Therefore, "[a] person in custody is entitled to Miranda warnings prior to official interrogation." United States v. Miller, 116 F.3d 641, 679 (2d Cir. 1997) (citing Miranda, 384 U.S. at 444).

However, "[i]f, after receiving Miranda warnings and invoking the right to counsel, 'the accused himself initiates further communication, exchanges, or conversations with the police,' those unsolicited statements are admissible." Id. at 680 (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)). As the Supreme Court has explained, the standard set forth in Edwards is satisfied where a defendant's communication "evince[s] a willingness and a desire for a generalized discussion about the investigation" rather than "merely a necessary inquiry arising out of the incidents of the custodial relationship." Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983).

On these principles, the appropriate analytical framework is as follows: "[i]f there is questioning after [an] arrestee invokes his right to counsel . . . his responses may be admitted in

4

evidence 'only on finding that [the arrestee] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.'" Miller, 116 F.3d at 680 (quoting Smith v. Illinois, 469 U.S. 91, 95 (1984)).

It is undisputed that Motley was informed of his Miranda rights and chose not to waive them. He was provided a "Statement of Rights" form, the contents of which Ortiz read to him. Motley initialed the form, confirming that he understood each of his rights, and Ortiz's handwritten comment confirms that Motley "declined to waive" them. Although Auman's testimony that Motley did not request counsel conflicts with Motley's averment that he did, there is no dispute that Motley verbally indicated that he "did not want to talk to" HSI agents.

It is also undisputed that Auman questioned Motley after this invocation when he asked Motley "[H]ow do you think we found you?"[3] Motley's post-arrest statements are therefore admissible only if the Government demonstrates initiation and waiver. Id. at 680.

1. **Initiation**

Motley has conceded, and in any case the Court finds, that he initiated the above-referenced exchange with Auman. See Tr. 32:13-15 (MS. GATTO: . . . "[W]as conversation initiated? And there is no dispute. The facts are the facts. A conversation was initiated by Mr. Motley."). The Court further finds that, by asking "[H]ow did you all find me?", Motley sought information from Auman as to the nature of investigative techniques employed by HSI that led to

---

[3] "[T]he term 'interrogation' under Miranda refers not only to express questioning, but to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). The Court credits Auman's testimony that his response was "an effort to blow [Motley] off, to not give any type of real answer, just to kind of place it in his mind that [Auman] wasn't going to discuss any type of substantive criminal investigative techniques with [Motley]." In light of this testimony, and viewed in the context of his exchange with Motley, the Court is persuaded that Auman did not pose his question to gather incriminating information, but rather to avoid further discussion on the topic about which Motley inquired. Nonetheless, Innis instructs that the definition of "interrogation" focuses not on the "intent of the police" but the "perceptions of the suspect." Id. at 301. Therefore, although the Court has no basis to believe that Auman sought to incriminate Motley, Auman's response falls within the Supreme Court's broad definition of "interrogation."

his arrest. Such a question "evinced a willingness and a desire for a generalized discussion about the investigation." Bradshaw, 462 U.S. at 1045-46; see also United States v. Stewart, 770 F. Supp. 872, 879 (S.D.N.Y. 1991) ("By asking what evidence Agent Finn had against him, defendant clearly evinced a willingness and a desire for a generalized discussion about the investigation.") (internal quotation marks omitted); Tr. 31:23-32:4 ("MS. GATTO: . . . I think it is fair for the Court to say that it is a question about the investigation.").

2. **Waiver**

Motley does assert, however, that the Government has failed to prove that he knowingly and voluntarily waived the rights he had previously invoked. (Tr. 32:16-33:1.) As the Second Circuit has explained:

> [t]he waiver inquiry, itself, has two "distinct" components. First, we must satisfy ourselves that the relinquishment of rights was "knowing," which is to say that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Second, it must have been "voluntary," which is to say "that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id.

United States v. Plugh, 648 F.3d 118, 127 (2d Cir. 2011).

Resolving these issues requires examination of "the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." Edwards, 451 U.S. at 486 n.9; see also North Carolina v. Butler, 441 U.S. 369, 374-75 (1979) ("[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'") (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). While, "[a]s a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish

the protection those rights afford," Berghuis v. Thompkins, 130 S. Ct. 2250, 2262 (2010), it nonetheless remains the Government's "heavy burden" to demonstrate waiver. Butler, 441 U.S. at 372-73 (quoting Miranda, 384 U.S. at 475).

The Court finds that the Government has met that burden in this case.

The Court is satisfied that Motley knowingly waived his rights. At the time of his arrest, Motley was a thirty-eight year old man who had attended "some" college. He was also at least to some extent familiar with the procedures of arrest, even though there is no specific evidence that he was read his rights in connection with his 1999 arrest. See Stewart, 770 F. Supp. at 879 (citing evidence that "defendant was 33 years old, a high school graduate, had attended one year of college . . . [and] had previously been arrested" as supportive of finding of knowing waiver). Furthermore, the substance of Motley's initial question to Auman—"[H]ow did you all find me?"—which probed for information regarding the investigative techniques that led to his arrest, is itself indicative of Motley's awareness of law enforcement procedures. So too is Motley's response when Auman redirected that same question to him: Motley accurately surmised that HSI tracked him through his cell phone. See Filippi, 2013 WL 208919, at *2-3 (discussing tracking warrant obtained for two cell phones, one of which "was, according to Motley, 'associated' with him").

The Court is also satisfied that Motley voluntarily waived his rights. Auman's testimony establishes that Motley's arrest and processing were routine in nature, and there is no evidence to suggest that he was threatened, intimidated, coerced or deceived. No agent other than Auman was alone with Motley during the relevant time frame. The HSI agents with whom Motley interacted did not have their service weapons, and Motley does not appear to have been

handcuffed.[4]  Indeed, no other agents were even present when Motley initiated communication with Auman and there is no allegation that Auman acted in an abusive, aggressive or otherwise inappropriate manner.  Accordingly, the totality of the circumstances demonstrates that Motley knowingly and voluntarily waived his rights.

The sole Second Circuit case Motley cites does not compel a different conclusion.  In United States v. Montana, 958 F.2d 516 (2d Cir. 1992), following the defendant's election not to make any statements after being advised of his Miranda rights, a Drug Enforcement Administration ("DEA") agent told him and a co-defendant on the way to the courthouse that "they could help themselves by cooperating."  Id. at 517.  The defendant responded by asking "who would take care of his family."  Id.  Later that afternoon, while waiting in a courtroom to be presented, the defendant initiated a conversation with a different DEA agent.  Id. at 517-18.  Specifically, the defendant "began the conversation by shaking his head and saying that he could not believe he was in all this trouble for only $50."  Id. at 519.  An interrogation ensued, during which the defendant made additional inculpatory statements.  Id. at 518.

The Second Circuit found the statement the defendant made in the car suppressible because the DEA agent had violated his "right to cut off questioning."[5]  Id. at 519.  It further found, however, that the statements the defendant made while waiting in the courtroom were admissible.  The court reasoned, *inter alia*, that the defendant "began the conversation" with a "volunteered" statement, "made in the non-threatening surroundings of a Magistrate Judge's hearing room" "some four hours after [he] had declined to answer . . . pedigree questions at the

---

[4]  Although Motley states in his affidavit that he "was handcuffed," he provides no information as to where or for how long he was handcuffed.  (Motley Aff. ¶ 4(a).)  The Court therefore has no basis to discredit Auman's recollection that Motley was not handcuffed in the interview room.

[5]  The Second Circuit noted that "[n]o harm resulted" from this violation because "the District Judge [had] excluded evidence of the conversation in the car on relevancy grounds."  Id. at 519.

DEA office" and three hours after the DEA agent's comment regarding cooperation in the car. Id. Accordingly, it concluded that the defendant "had ample opportunity to reassess his situation and voluntarily determine whether to waive his constitutional right." Id.

The Montana court's analysis as to the circumstances surrounding the statements it ultimately deemed admissible is instructive. Here, too, Motley's statements were "volunteered" in what the evidence has demonstrated were relatively "non-threatening surroundings." Although Motley's statements were made a half hour after he invoked his rights, which is, to be sure, a shorter time period than the "ample" gap present in Montana, Montana in no way purports to set the standard as to how much time must pass before a valid waiver may occur. Instead, the court there simply engaged in a totality of the circumstances inquiry to determine whether the government had met its burden, as we are directed to do by Edwards. Similarly, under the totality of the present circumstances, the Court finds that Motley had sufficient opportunity to reassess his situation and "voluntarily determine whether to waive his constitutional right," and he did just that.[6]

---

[6] Motley directs the Court to two other cases, neither of which dissuade the Court from reaching the foregoing conclusion. In United States v. Hamilton, 503 F. Supp. 2d 563, 564-65 (E.D.N.Y. 2007), the defendant started making spontaneous statements on the way to the agent's vehicle promptly after being arrested and seeking to speak with an attorney. Accordingly, the court concluded that "the Government ha[d] not established that there was any significant lapse of time between the initial invocation of his Miranda rights and his first spontaneous statement." Id. at 566. Furthermore, unlike in the case at hand, the defendant in Hamilton repeatedly made spontaneous statements after reinvoking his rights. Id. at 563-65. "These reinvocations," the court concluded, "countermand whatever inference of waiver might otherwise be drawn from Hamilton's unsolicited statements." Id. at 567. Auman asked only one question in response to Motley's inquiry regarding how he was found and at no time prior did Motley reinvoke his rights.

United States v. Montgomery, 714 F.2d 201 (1st Cir. 1983), is similarly distinguishable. In Montgomery, less than an hour after refusing to waive his rights "until he had spoken with an attorney," the defendant initiated an exchange with a Bureau of Alcohol, Tobacco and Firearms ("ATF") agent by asking: "Am I being charged with each gun?" Id. at 202. The agent responded that he would "probably be charged with two counts," to which the defendant asked another question and the agent followed up with questions of his own, resulting in incriminating statements by the defendant. Id. Although the facts in Montgomery do indeed bear some resemblance to those of the instant case, there are also significant differences. First, in Montgomery, the defendant's initiating statement was a "natural, if not inevitable, query" as to "the nature of the charges against him," id. at 203-04, not a question directed to the details of the investigation leading to his arrest. Second, the exchange between the ATF agent and the defendant in Montgomery was inherently different from Auman's exchange with Motley. In Montgomery, as

9

## CONCLUSION

For the reasons stated above, the Court finds that Motley's post-arrest statements were made after he initiated further discussion with police and knowingly and voluntarily waived his Miranda rights. Accordingly, Motley's motion is denied.

SO ORDERED.

Dated:   June 6, 2013
         New York, New York

                                                    _____
                                                    Ronnie Abrams
                                                    United States District Judge

---

Motley's counsel noted, law enforcement purposefully "extend[ed] th[e] conversation," (Tr. 43:3-11), by asking the defendant a question to "(1) to keep the conversation going in the hope that something would turn up; and (2) to elicit incriminating information." 714 F.2d at 204. The Montgomery court suggested that the agent's interrogation, therefore, "use[d] a suspect's simple, not-guilt-suggestive question as a license to launch a fishing expedition." Id. at 204-05. As noted above, see n.3, supra, that was not the aim of Auman's question, of which, regardless, there was only one. Third, the Montgomery court found that the government had offered "no evidence of anything, external or internal, that would support a finding of a 'knowing and intelligent' abandonment of the position taken so clearly so recently." Id. at 204. The court's decision that suppression was proper, therefore, apparently hinged on the government's failure of proof. The court appears not to have been presented with, or at least did not discuss, evidence regarding "the background, experience, and conduct of the accused," Zerbst, 304 U.S. at 464, which are among the factors under which "[w]aiver always has been evaluated." Edwards, 451 U.S. at 492 (Powell, J., concurring). In any event, the Court questions whether in Montgomery, there was indeed "no affirmative statement made [by defendant], no hint of willingness to talk about his involvement, [and] no suggestion that he had changed his mind in the short interval that had elapsed since he requested counsel before he agreed to waive his rights," 714 F.2d at 204, as that court concluded. As an initial matter, the law is not so rigid as to require any "affirmative statement" of waiver in this context. See Berghuis, 130 S.Ct. at 2261 ("[W]aivers can be established even absent formal or express statements of waiver."); Butler, 441 U.S. at 375-76 ("[A]n explicit statement of waiver is not invariably necessary to support a [waiver] finding."). Furthermore, it is arguable that the Montgomery court's conclusion that there was "no hint of willingness [by the defendant] to talk about his involvement, [and] no suggestion that he changed his mind" is inconsistent with the nature of the defendant's own post-arrest statements ("Am I being charged with each gun?"; "Did all of the guns fire?"). Edwards directs courts to conduct a "totality of the circumstances" inquiry, including consideration of "the necessary fact that the accused, not the police, reopened the dialogue with the authorities." 451 U.S. at 486 n.9. The Court has done so here and nothing in Montgomery leads it to reach a conclusion other than that Motley knowingly and voluntarily waived his previously invoked Miranda rights.